UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:26-cr-00134 |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| v. | ) | |
| OCTAVIOUS ODOM, | ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

Before the Court is Defendant Octavious Odom's motion to suppress a firearm seized from his car during a traffic stop. (Doc. 20.) The motion is fully briefed (Docs. 23, 24), and the Court held an evidentiary hearing during which it received testimony from various law enforcement officers involved in the traffic stop (Aug. 14, 2026 Minutes of Proceedings). For the reasons that follow, Odom's motion to suppress is GRANTED.

## I. BACKGROUND

On a late night in January 2026, Odom was driving through Cleveland in his black Jeep. (Doc. 20-1 at 98.)[1] At one point, Odom passed an unmarked patrol vehicle holding Deputy Jacob Englehart, an officer with the Cuyahoga County Sheriff's Department. (Hr'g Tr. at 119, 123, 125.) As Odom passed by, he briefly stopped and rolled down his windows. (*Id.* at 126.) This allowed Deputy Englehart to observe that the Jeep's windshield was illegally tinted and that

[1] Citations to conventionally filed exhibits use the parties' naming convention. (*See* Doc. 22.) Citations to the hearing transcript use internal pagination. Otherwise, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

there were two individuals in the vehicle. (*Id.*) Deputy Englehart then radioed other units in the area to share his observations, as well as to hand off Odom's Jeep to marked patrol vehicles for a traffic stop. (*Id.* at 18, 127-28.)

Deputy Koniba Sissoko was in the first marked vehicle to encounter Odom's Jeep after this radio message. (*Id.* at 18, 74.) Deputy Sissoko began following the Jeep, during which he noted that Odom was driving too quickly for the road conditions—about 35 miles per hour on dark and icy roads—something he characterized as evasive driving. (*Id.* at 21, 28.) Deputy Sissoko also saw Odom commit a traffic violation when Odom failed to stop at a red light and looped to the right of another stopped car. (*Id.* at 20.) After Odom made the right-hand turn, Deputy Sissoko lost sight of him. (*Id.* at 21.)

Other officers were able to quickly locate Odom again. Less than a minute after Deputy Sissoko lost Odom, and less than three minutes total after Deputy Englehart first radioed, Deputy David Garber spotted the Jeep driving past him in the opposite direction. (*Id.* at 22, 80; Ex. B at 0:11-0:14.) Deputy Garber turned his patrol vehicle around and accelerated as best he could given the snowy road conditions. (Ex. B at 0:14-1:05.) About fifty seconds later, Deputy Garber reached Odom as the latter was backing into a driveway. (*Id.*) As Odom reached the back of the driveway, Deputy Garber turned on his lights and pulled into the driveway himself to initiate a traffic stop. (*Id.* at 0:57-1:05.)

Although Deputy Englehart had reported seeing two individuals, only Odom exited the Jeep. (*Id.* at 1:02-1:43.) Deputy Garber's partner, Deputy Nikolas Spillman, called Odom over and asked Odom whether there were any other passengers in the Jeep. (Ex. H at 0:51-0:58.) Odom answered that there were none. (*Id.* at 0:58-1:02.) Deputy Spillman made his way over to the Jeep to check, looking into the vehicle and shining his flashlight through the windshield and

driver's window. (*Id.* at 1:02-1:20; Ex. B at 1:43-1:57; Ex. D at 1:14-1:19.) Seeing no one, he returned to the area where Deputy Garber was standing with Odom. (Ex. H at 1:20-1:28.)

While Deputy Spillman was investigating the Jeep, Deputy Garber questioned Odom. Despite expressing some concern about the situation when pulling into the driveway, Deputy Garber did not immediately pat down Odom as he approached. (Ex. D at 0:33-0:36, 0:57-1:09.) Rather, Deputy Garber allowed Odom to approach with his hands in the front pockets of his hooded sweatshirt and to keep his hands in these front pockets for the next minute. (*Id.* at 1:00-2:00.) Only after collecting Odom's identifying information did Deputy Garber pat down Odom for weapons. (*Id.* at 2:00-2:20.) Odom was not armed. (*Id.*)

For the next minute after that, little activity occurred. Several other officers had arrived on scene by then, but most did no more than stand around and observe. (*See id.* at 2:20-3:17; Ex. C at 2:40-3:55; Ex. E at 2:14-3:23; Ex. H at 2:18-2:40.) The only notable action during that period occurred when Deputy Sissoko directed Deputy Spillman to check the Jeep's license plate. (Ex. E at 2:37-2:42; Hr'g Tr. at 36.) In response, Deputy Spillman walked back up the driveway to Odom's Jeep. (Ex. H at 2:40-3:28.) This time, however, he did not peer into the Jeep's interior to look for a second passenger. (*Id.*)

Eventually, Deputy Englehart arrived on scene and immediately proceeded up the driveway to Odom's Jeep. (Ex. F at 0:00-0:31.) As Deputy Englehart was walking towards the Jeep, Deputy Spillman told him, "He's [Odom] the only one in the car." (Ex. H at 3:30-3:39.) Nonetheless, Deputy Englehart continued to the Jeep to search for a second passenger. (*Id.*) Like Deputy Spillman, he examined the inside of the car by shining his flashlight through the driver's side windows without finding a second person. (Ex. F at 0:31-0:48.) Unlike Deputy Spillman, though, Deputy Englehart noticed an open container of alcohol sitting on the floor of

the Jeep. (*Id.* at 0:42-0:48.) Based on that discovery, officers handcuffed Odom. (Hr'g Tr. at 39.) They also searched his Jeep, discovering a gun in the glovebox. (Ex. F at 4:06-4:14.)

Odom now moves to suppress this gun as the fruit of a Fourth Amendment violation. (Doc. 20.)

## II. ANALYSIS

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. If government officers violate this right, courts must usually "suppress the resulting evidence." *United States v. Bateman*, 945 F.3d 997, 1005 (6th Cir. 2019).

Odom argues that the Court should suppress the gun seized from his car because officers violated the Fourth Amendment at three different points after his initial encounter with Deputy Englehart. He claims (1) officers' justification for making a traffic stop was stale by the time they stopped Odom in his driveway; (2) officers unreasonably intruded upon the curtilage of Odom's house without a warrant and without exigent circumstances; and (3) officers could not search the interior of his Jeep under the automobile exception or plain view doctrine.

The Court finds that officers' justification for stopping Odom was not stale. However, the Court concludes that Odom's Jeep was parked on curtilage during the traffic stop, so officers could not approach the Jeep without a warrant or applicable warrant exception. Officers did not have a warrant, and the exception for exigent circumstances did not apply. Because officers could not constitutionally approach the Jeep, neither the automobile exception nor plain view doctrine permitted officers to search the Jeep. Therefore, the gun that officers discovered in the glovebox of Odom's Jeep must be suppressed.

**A. Staleness**

"In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). In this case, officers had probable cause of two traffic infractions: the tinted windshield on Odom's Jeep, and his illegal maneuver to drive around a car stopped at a red light. (Hr'g Tr. at 20, 126.) Odom does not challenge the validity of this probable cause. (*Id.* at 166-67.) He argues only that the probable cause became stale because officers did not pull him over soon enough after observing those infractions.

"[W]here an officer is in possession of information that creates the basis for probable cause, he is required to act upon this information within a reasonable period of time—otherwise the existence of probable cause is said to have become stale." *United States v. Copeland*, 321 F.3d 582, 594 (6th Cir. 2003). Whether officers waited too long depends on "the circumstances of each case" and "the inherent nature of the crime." *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006). The key consideration is whether the observed infraction is continuous and ongoing, or fleeting and changeable. *Id.* (citing *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998)). "The passage of time becomes less significant when the crime at issue is ongoing or continuous and the place to be searched is a secure operational base for the crime" because evidence of such criminal activity is likely to be enduring. *Id.* By contrast, when dealing with a crime or infraction that is transient, like a parking violation, "the time in which a [] vehicle can reasonably be stopped . . . is relatively limited." *Copeland*, 321 F.3d at 594; *see also United States v. Redmond*, 475 F. App'x 603, 608 (6th Cir. 2012) (comparing information on one-time drug transactions, which "goes stale very quickly," with information on "long-term operations" that "may allow for greater lapses of time" (first quoting *United States v. Brooks*, 594 F.3d 488,

493, 494 n.4 (6th Cir. 2010); and then quoting *United States v. Thomas*, 605 F.3d 300, 310 (6th Cir. 2010))).

Here, the tinted windshield is a continuous and ongoing infraction. There was little chance that anything about the windshield's tint would change in the roughly four minutes from Deputy Englehart's initial observations to the start of the traffic stop in Odom's driveway. (*See* Hr'g Tr. at 80 (three minutes from Deputy Englehart's observations to Deputy Garber's initial encounter with Odom's Jeep); Ex. B at 0:11-1:05 (less than one minute between Deputy Garber's initial encounter and the traffic stop).) The probable cause supplied by the windshield therefore was not stale when the stop was made.

Even setting aside the tinted windshield and focusing only on Odom's red-light violation as a basis for probable cause, officers stopped Odom within a reasonable time. As officers testified, they were trained not to turn on their lights and initiate a traffic stop until they were right on the bumper of the target car. (Hr'g Tr. at 11.) This was so they could take down the plate and identify the driver. Doing so allowed officers to avoid the danger of a pursuit in case the driver later tried to flee; officers could allow the driver to flee in the moment (avoiding a chase) and locate the driver later. (*Id.*) Officers were not able to stop Odom immediately because they were unable to get their patrol vehicles in position behind Odom's bumper. But they were still able to stop Odom in under four minutes.[2] Given the safety rationale behind the bumper policy, such a brief delay was reasonable. *See Copeland*, 321 F.3d at 594-95 (holding a brief delay between a parking violation and stop to be reasonable when a third car briefly drove between the patrol vehicle and target car).

---

[2] About four minutes passed between Deputy Englehart's observations about the tinted windshield and the traffic stop. The red-light violation occurred after those observations.

Accordingly, the Court concludes that probable cause had not become stale when officers stopped Odom.

### B. Curtilage and Exigency

While the traffic stop was proper, it is a separate question whether officers could approach Odom's car during the stop without a warrant. That is because Odom had backed his car up his driveway. If the area of the driveway where he parked his car constitutes curtilage, officers would have needed a warrant (or satisfied a warrant exception) to step foot in that area for the purpose of searching Odom's car or otherwise gathering evidence. *Collins v. Virginia*, 584 U.S. 586, 593, 601, 138 S. Ct. 1663, 201 L. Ed. 2d 9 (2018).

***Curtilage.*** The Court begins by determining whether the area of the driveway where Odom's car was parked constitutes curtilage. Curtilage is the "area 'immediately surrounding and associated with the home'" and "to which the activity of home life extends." *Florida v. Jardines*, 569 U.S. 1, 6-7, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 180, 182 n.12, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984)). This definition, however, has proven more easily stated than applied. *See United States v. Gregory*, 497 F. Supp. 3d 243, 261 (E.D. Ky. 2020) ("[D]efining the curtilage of a home is not always an easy task."). As relevant here, there is no categorical rule on whether driveways are curtilage. Determining if a particular driveway is curtilage requires a "fact-intensive analysis" that may vary on a "case-by-case basis." *United States v. Coleman*, 923 F.3d 450, 455 (6th Cir. 2019) (quoting *Morgan v. Fairfield County*, 903 F.3d 553, 561 (6th Cir. 2018)). That analysis can lead to different results. *Compare, e.g.*, *id.* at 456-57 (not curtilage), *with Collins*, 584 U.S. at 593-94 (curtilage).

To guide their curtilage determinations, courts rely on four *Dunn* factors: "(1) proximity to the home; (2) whether the area is within an enclosure around the home; (3) uses of the area;

and (4) steps taken to protect the area from observation by passersby." *Coleman*, 923 F.3d at 455 (citing *United States v. Dunn*, 480 U.S. 294, 301, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987)). Odom bears the burden of proving curtilage under these four factors. *Id.* (quoting *United States v. Witherspoon*, 467 F. App'x 486, 490 (6th Cir. 2012)). The Court concludes that Odom has carried his burden of showing that his driveway—at least the top portion where the Jeep was parked—is curtilage.

The top portion of Odom's driveway is much like the portion of driveway that the Supreme Court held to be curtilage in *Collins v. Virginia*, 584 U.S. at 593-94. For starters, Odom's driveway is adjacent to the house and "runs alongside the front lawn and . . . past the front perimeter of the house." *Id.* at 593. (Ex. B at 0:57-1:05.) Indeed, the top portion of Odom's driveway directly abuts the house's walls. (Ex. B at 1:05.)

Like the driveway in *Collins*, the top portion of Odom's driveway also "sits behind the front perimeter of the house [and] is enclosed on [three sides]." 584 U.S. at 593. (Ex. B at 1:05.) Viewed from the street, Odom's car is hemmed in by the house on the left, a wire fence on the right, and a detached garage to the back. (Ex. B at 1:05.) Even though the fence does not completely block the sight of passersby, this fact does not suggest a lack of enclosure. *See Jardines*, 569 U.S. at 7 (describing the front porch, which is usually not blocked from view, as "the classic exemplar" of curtilage). As long as the fence physically obstructs someone from accessing the area, it encloses the area. *See United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (holding that a wire fence enclosed a backyard and supported a finding of curtilage because the fence "ma[de] it impossible for someone to enter the yard . . . without using the gate or climbing over the fence"). In any case, while some parts of the fence could be seen through,

the section of the fence near Odom's car was covered by leafy foliage which did block the view. (Ex. F at 4:59; Ex. H at 2:46-2:52.)

What is more, the top portion of Odom's driveway "is a good distance from the road," further separating it from the public. *Jenkins*, 124 F.3d at 773. And the fact that the top portion sits behind the front perimeter of the house means that "[a] visitor endeavoring to reach the front door of the house would have to walk partway up the driveway, but would turn off before entering the [enclosed area] and instead proceed up a set of steps leading to the front porch." *Collins*, 584 U.S. at 593. (Ex. B at 0:53-1:05.)

Finally, while there is little in the record about how Odom uses the top portion of his driveway, the Court observes that the area where Odom parked is next to his back door. (*See* Ex. F at 1:29.) That is similar to the driveway in *Collins*, where "[a] side door provide[d] direct access between [the] partially enclosed section of the driveway and the house." 584 U.S. at 593. Odom's back door is a little further removed from the relevant area of the driveway than the side door in *Collins*, but the close proximity between Odom's back door and upper driveway still weighs slightly in favor of finding that portion of the driveway to be curtilage.[3]

---

[3] The Sixth Circuit has suggested, albeit without expressly holding, that "regularly parking" in an area "arguably" supports a finding of curtilage under the use-of-the-area *Dunn* factor, at least if coupled with the "legal right to exclude others." *United States v. May-Shaw*, 955 F.3d 563, 571 (6th Cir. 2020). If this principle is correct, that is another mark in favor of curtilage, as Odom parks on his driveway and has the right to ask others to leave his property. *See Wolford v. Lopez*, 146 S. Ct. 2032, 2049, 225 L. Ed. 2d 494 (2026) (acknowledging "the undisputed principle that the owner of private property is generally free to exclude anyone from entering without consent"). Because it is not fully clear if the Sixth Circuit has endorsed this idea, however, the Court does not rely on it.

Taking all these factors together, the Court concludes that the unique facts presented here demonstrate the top portion of Odom's driveway is so similar to the driveway in *Collins* that it is curtilage.

None of the government's authorities compel the opposite result. In *United States v. Coleman*, the Sixth Circuit held that the driveway at issue was not curtilage because it "was sitting in front of the residence, was not enclosed by anything, and was on the way to the entrance of his home." 923 F.3d at 456. The *Coleman* driveway was also part of a condo, so it was "shared with other families[,] and other condo residents frequently walked past cars parked in front of condo units." *Id.* None of that is true of the top portion of Odom's driveway, which sits behind the front perimeter of the house, is enclosed, is not on the way to the front door, and is private property. (Ex. B at 1:05.) The only similarity between the circumstances here and those in *Coleman* is that the cars involved were not covered. *Coleman*, 923 F.3d at 456. (Ex. B at 1:05.) That fact is of minimal significance in this case, however, because officers stopped Odom as soon as he pulled into the driveway. He did not have time to cover his car even if he had wanted to. Regardless, the covering of the car is just one factor among many, and foliage on the fence did provide some visual obstruction.

*United States v. May-Shaw*, 955 F.3d 563 (6th Cir. 2020), is even less helpful to the government. That case involved a covered carport in a communal parking lot in front of the defendant's apartment building, not a driveway directly abutting the home. *Id.* at 565, 571. There was also no indication that the defendant had any right to use that specific carport such that he could prevent others from using it. *Id.* That situation is very different than the one here, which involves a private driveway.

The government's remaining two cases—*United States v. Galaviz*, 645 F.3d 347 (6th Cir. 2011), and *United States v. Estes*, 343 F. App'x 97, 101 (6th Cir. 2009)—offer no more aid. In *Galaviz*, the driveway was not enclosed, and "the portion of the driveway where Galaviz's car was parked directly abutt[ed] the public sidewalk." 645 F.3d at 356. By comparison, Odom's car was parked in an enclosed portion of the driveway well back from the public sidewalk. (Ex. B at 0:53-1:05.) *Galaviz* also involved a driveway that was not protected from observation by hedges or bushes, while Odom's driveway was protected by foliage on the fence. 645 F.3d at 356. (Ex. F at 4:59; Ex. H at 2:46-2:52.) *Estes* is similarly distinguishable. The driveway there was not enclosed and not protected from observation. 343 F. App'x at 101. It was also used as a point of entry to the home, while visitors trying to reach Odom's front door would have to turn off before reaching the portion of driveway where he parked. *Id.* (Ex. B at 0:53-1:05.)

In sum, the particular facts presented here establish that the top portion of Odom's driveway, where his Jeep was parked, is curtilage.

***Exigency.*** There is no dispute that officers lacked a warrant, so they could only enter curtilage and approach Odom's Jeep if a warrant exception applied. The exception that the government invokes is exigency. (Doc. 23 at 125-26.)

This exception applies when "the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable." *Kentucky v. King*, 563 U.S. 452, 460, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011) (citation modified) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)). Courts have recognized various categories of exigencies that justify warrantless entries, ranging from concern that evidence might be destroyed to fears for the immediate safety of individuals in a home.

*Howell v. McCormick*, 148 F.4th 834, 844 (6th Cir. 2025). The pertinent category in this case is officers' fear for their own safety. *Id.*

The existence (or not) of exigency turns on "a fact-specific test that evaluates whether an emergency existed from the perspective of a reasonable officer." *Id.* This test requires courts to consider the totality of the circumstances at the time of the warrantless entry. *Reed v. Campbell County*, 80 F.4th 734, 743 (6th Cir. 2023); *United States v. Smith*, 386 F.3d 753, 759 (6th Cir. 2004). And it requires officers to have "more than a mere hunch or suspicion before an exigency can excuse" warrantless entry. *Smith*, 386 F.3d at 759 (quoting *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996)). The government bears the ultimate burden of proving that there were exigent circumstances. *Howell*, 148 F.4th at 844.

The crux of the government's exigency argument is that officers reasonably believed there was a risk to their safety because Deputy Englehart observed two people in the Jeep (Odom and another passenger), and officers did not know where the second passenger was. There are two problems with this exigency argument.

The first problem is that the mere presence of a potential second person, without more, does not create an objectively reasonable threat to officer safety. Establishing an exigency based on officer safety "is not easy." *Morgan*, 903 F.3d at 562 (quoting *United States v. Purcell*, 526 F.3d 953, 960 (6th Cir. 2008)). It requires a "particularized showing of a risk of *immediate* harm"; "generic possibilities of danger" are insufficient. *Id.* (emphasis added). Even in situations where officers have confirmed that a weapon is involved, there must be specific reason to believe that a suspect is "likely to use a weapon or become violent." *Hoover v. Due*, 152 F.4th 749, 759 (6th Cir. 2025) (quoting *Bates*, 84 F.3d at 795); *see also Barton v. Martin*, 949 F.3d

938, 948-49 (6th Cir. 2020) (explaining that the presence of firearms in a residence does not create an exigency by itself).

Measured against this high bar, the presence of a second passenger is not exigent. Cars often contain multiple passengers, so mere presence is too generic to support exigency. Instead, the government must establish some particularized reason to believe that this second passenger was likely to use violence. It has not done so.

The pertinent point in time for the analysis is when Deputy Englehart walked up the driveway to Odom's Jeep and observed the open bottle of alcohol. At that point, officers had not yet discovered any weapons and there was no indication that either Odom or this second passenger was likely to be violent. In fact, none of the officers acted as if they faced any immediate threats when they stopped Odom in his driveway. Deputy Garber permitted Odom to keep his hands in his front sweatshirt pockets for approximately a minute before patting him down, illustrating Deputy Garber's lack of concern that Odom was armed or would become violent. (Ex. D at 1:00-2:00.) Deputy Spillman also twice approached the Jeep without being tense or on guard against a potential attack by some second passenger, and he twice turned his back to the Jeep without worry. (*See* Ex. B at 1:42-1:57, 3:19-4:06.) Tellingly, Deputy Spillman was "in [] training" and not allowed to "be on his own." (Hr'g Tr. at 61; *see also id.* at 74-75.) Yet the other officers were comfortable enough with the situation to send him by himself towards the Jeep, hardly an indication that they believed the Jeep contained any danger. Indeed, most of the officers were standing around without much urgency. (*See* Ex. C at 2:40-3:55; Ex. D at 2:20-3:17; Ex. E at 2:14-3:23; Ex. H at 2:18-2:40.)

The sole particularized fact that the government can point to is that Deputy Garber commented "I don't like this" to Deputy Spillman when the two pulled into Odom's driveway.

(Ex. D at 0:33-0:36; Hr'g Tr. at 89.) According to Deputy Garber, that was because he was in an unknown driveway and saw Odom "reaching around" in the Jeep. (Hr'g Tr. at 89.) But Deputy Garber also explained he did not view "reaching around" as a threat. Based on his experience, he testified that reaching was "either to hide something or to maybe grab their ID or something or insurance or something like that." (*Id.* at 90.) The Sixth Circuit has held that far stronger indications of threat do not create exigency. *See Hoover*, 152 F.4th at 759 (911 call "report[ing] that a man had threatened the caller with a gun" did not create exigency when officers did not observe a weapon after arriving on the scene); *Barton*, 949 F.3d at 949 (belief that the suspect shot a stray cat not enough). So, the circumstances in this case do not create an exigency either.

The second problem for the government is that, even if the Court were to assume that the presence of an unknown second person could create an exigency, any such exigency dissipated before Deputy Englehart approached Odom's Jeep to search it. Crediting Deputy Englehart's testimony that he observed two people in the Jeep while Odom was driving, by the time Deputy Englehart reached Odom's driveway, it should have been clear to a reasonable officer that there was no second passenger.

After Deputies Garber and Spillman pulled into Odom's driveway, the dashcam on their patrol vehicle showed that only one person, Odom, got out of the Jeep. (Ex. B at 1:02-1:43.) Deputy Spillman then went immediately to check the Jeep for other passengers, did not see a second passenger, and reported nothing back to the other deputies. (*Id.* at 1:43-1:57.) Later, when Deputy Englehart arrived, Deputy Spillman told him explicitly that Odom was "the only one in the car." (Ex. H at 3:35-3:39.) It was not reasonable at that point to believe that a violent second passenger was in the Jeep or had somehow exited and hidden himself on the property nearby, prepared to attack officers. The only reasonable conclusion was that, to the extent there

was a second passenger in the car earlier, the passenger had gotten out of the car during the brief period when officers lost sight of Odom's Jeep during their pursuit.

Separately, the government contends that Odom was driving evasively, and that the evasive driving created exigency. The factual basis for Odom's evasive driving is thin. The only reason officers believed Odom was being evasive was because he was driving too quickly for road conditions. (Hr'g Tr. at 21.) Speeding, however, is not the same as evading law enforcement, especially when officers did not turn on their lights until after Odom had already stopped in his driveway. (Ex. B at 0:57-1:01.) The Court concludes that Odom was not being evasive.

Even if the Court were to credit officers' assessment that Odom was being evasive, this supposed evasiveness would not have created any exigency. To say that Odom was evading law enforcement is equivalent to saying that law enforcement was in hot pursuit of Odom. As Odom argues and the government does not contest, the hot pursuit of suspected misdemeanants (or those like Odom who are suspected of even more minor infractions) cannot alone supply exigency even if the pursuit of suspected felons can. *Lange v. California*, 594 U.S. 295, 304-09, 141 S. Ct. 2011, 210 L. Ed. 2d 486 (2021). This means the fact that officers observed Odom's traffic violations cannot by itself justify warrantless intrusion onto Odom's curtilage. The government would still need to establish some kind of officer-safety rationale, and it has failed to do so.

For these reasons, the Court concludes that officers lacked exigent circumstances and violated Odom's Fourth Amendment rights when they approached his Jeep without a warrant.

### C. Automobile Exception and Plain View

Having concluded that the officers could not have approached the Jeep, the Court rejects the government's automobile exception and plain view arguments. The automobile exception does not "justif[y] the invasion of the curtilage." *Collins*, 584 U.S. at 594. And for the plain view doctrine to apply, officers must be "legally present" in the area where they observe evidence to be seized. *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007). Per the Court's analysis above, officers were not legally present by Odom's Jeep when they observed the open bottle of alcohol leading them to search the Jeep. Accordingly, the plain view doctrine does not apply.

## III. CONCLUSION

Officers discovered Odom's gun as a direct result of Fourth Amendment violations, so the gun must be suppressed. The Court consequently GRANTS the motion to suppress.

**IT IS SO ORDERED.**

Date: September 21, 2026

BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE